EXXON CORPORATION, Appellant,

v.

EASTMAN KODAK COMPANY,
Appellee.

No. 8696.

Court of Civil Appeals of Texas,
Texarkana.

Aug. 30, 1979.

Rehearing Denied Oct. 23, 1979.

Robert D. McGee, Houston, for appellant.

Thomas W. Hathaway, Hathaway & Jackson, Tyler, for appellee.

CORNELIUS, Chief Justice.

Exxon Corporation appeals from an adverse judgment in its suit against Eastman Kodak Company to recover indemnity for damages paid as a result of a pipeline explosion and fire.

The pipeline was built by Exxon to transport propane from its East Texas gasoline plants to Eastman's facility located in Gregg and Harrison Counties. The parties executed a preliminary letter of intent and later a formal contract which provided generally that Exxon would construct, maintain and operate the pipeline, and Eastman would reimburse Exxon for its costs in doing so and would have the option to acquire title to the line. The contract obligated Exxon, at Eastman's option, to carry liability insurance covering its operation and maintenance of the line. At first, Eastman required Exxon to carry such insurance, but later Eastman requested that the policy not be renewed unless Exxon wished to do so for reasons of its own. The reason for Eastman's decision was stated in its Exhibit B–8:

> "Reference is made to attached letter from Humble dated January 23, 1958 on the subject of pipeline casualty insurance.
>
> This policy was discussed on January 27, 1958 with Messrs. G. L. Dickinson and J. S. Witt. It was concluded that we were no longer interested in the policy if we could not also be named insured.
>
> Mr. Dickinson pointed out from the manual that we could not be named. He agrees with USF & G that we are covered under our own liability policy.
>
> We have written Humble that unless they desire to continue the coverage, for reasons of their own, the policy may be cancelled."

Exxon did not renew the policy. After the pipeline had been in use for some twenty years it developed a leak which ultimately caused an explosion and fire in which one person was killed and another was severely injured. It is stipulated that the leak was

due to Exxon's negligence. Exxon paid $2,148,305.82 in damage judgments and attorney's fees because of the accident, and then sought recovery of that amount from Eastman on the basis that the contract between them provided that Eastman would indemnify Exxon against losses of that type even though the losses were the result of Exxon's negligence.

Trial was to the court with most material facts stipulated. The trial judge rendered a take nothing judgment supported by written findings of fact and conclusions of law. The basis of his ruling was that the contract did not, as Texas law requires, express in clear and unequivocal terms an obligation on Eastman's part to indemnify Exxon against the consequences of its own negligence.

The correctness of the judgment below depends upon the proper interpretation of the contract. To make such an interpretation we must first review several basic principles of indemnity and contract law, and then examine the pertinent contractual provisions in the light of those principles.

■ An indemnity agreement will not be construed to protect the indemnitee against the consequences of his own negligence unless the contract so provides in clear and unequivocal terms. *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.,* 490 S.W.2d 818 (Tex.1972); *Sira & Payne, Inc. v. Wallace & Riddle,* 484 S.W.2d 559 (Tex. 1972); *Joe Adams & Son v. McCann Construction Company,* 475 S.W.2d 721 (Tex. 1972); *Spence & Howe Construction Co. v. Gulf Oil Corp.,* 365 S.W.2d 631 (Tex.1963); *Mitchell's, Inc. v. Friedman,* 303 S.W.2d 775 (Tex.1957). But it is not necessary that the contract, in certain words, *expressly* state the obligation. *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.,* supra; *Joe Adams & Son v. McCann Construction Company,* supra; *Spence & Howe Construction Co. v. Gulf Oil Corp.,* supra; *James Stewart & Co. v. Mobley,* 282 S.W.2d 290 (Tex.Civ. App. Dallas 1955, writ ref'd). It is only necessary that the agreement clearly reveal such an intention, so that the indemnitor will have fair notice of the extent of his

obligation. *Joe Adams & Son v. McCann Construction Company,* supra; *Spence & Howe Construction Co. v. Gulf Oil Corp.,* supra; *Mitchell's, Inc. v. Friedman,* supra; *Houston & T.C.R. Co. v. Diamond Press Brick Co.,* 111 Tex. 18, 222 S.W. 204 (Tex. Com.App.1920, holding approved). It has been said that an exception to the "clear terms" rule obtains when the contract provides for indemnity against injuries or damages caused by defects in *certain premises* or resulting from the *maintenance or operation of a specified instrumentality.* *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.,* supra; *Mitchell's, Inc. v. Friedman,* supra; *Houston & T.C.R. Co. v. Diamond Press Brick Co.,* supra. That proposition is not a true exception, however, but in reality is only an application of the general rule, for when indemnity is expressed with reference to specific premises or instrumentalities the indemnitor necessarily knows that he is assuming full responsibility for losses in connection with those particular premises or instrumentalities, regardless of whose negligence may cause the losses. *Joe Adams & Son v. McCann Construction Company,* supra; *Spence & Howe Construction Co. v. Gulf Oil Corp.,* supra; *James Stewart & Co. v. Mobley,* supra.

■ We have no difficulty in determining that several provisions of the Exxon-Eastman contract clearly and unequivocally express the intention that the indemnity obligation will include damages arising from the operation and maintenance of the pipeline even though such damages are the result of Exxon's negligence. The following quotations from the contract amply demonstrate that fact:

CONTRACT, Article II, Page 3, Lines 20, 21:

"EASTMAN agrees to reimburse HUMBLE for its costs and expense in operating . . . the pipeline, . . .".

CONTRACT, Article II, Page 3, Lines 7–14:

". . . HUMBLE shall keep an accurate record of its expenditures in carry-

ing out said obligation, . . . The items of expense . . . both in . . construction of said line and the operation (Not including pumping costs) and the maintenance thereof, shall be in accordance with those listed in the Accounting Procedure attached hereto . . . ".

ACCOUNTING PROCEDURE, Article I, Paragraph 8:

". . . Operator shall charge the Pipe Line Account with the following items:

. . . . .

8. *All costs and expenses of litigation,* . . . for the protection of each party hereto *including attorney's fees and expenses* as hereinafter provided, *together with all judgments obtained against the Pipe Line Account or the subject matter of this agreement; actual expenses* incurred by any party or parties hereto *in securing evidence for the purpose of defending any action or claim prosecuted or urged against the Pipe Line Account or the subject matter of the agreement* . . . ".

ACCOUNTING PROCEDURE, Article I, Paragraph 8A:

"Pipe Line Operator shall promptly notify Non-Operator of *the initiation or filing by third parties of any litigation or claim arising out of or connected with the performance of said agreement. Non-Operator shall have the right,* at its option, *to participate in the defense of any such litigation and to approve in advance the settlement* of any such claim."

CONTRACT, Article II, Page 4, Lines 5–9:

". . . EASTMAN shall have the right of inspection of the line at any time and shall have the right to require changes in maintenance procedures and maintenance work done if in EASTMAN'S opinion such changes are required for safe and economical operation and maintenance."

CONTRACT, Article X, Page 8:

"In the performance of this contract, HUMBLE agrees to carry public liability and property damage insurance in such amounts and limits and with such insurors as EASTMAN may request or approve. Premiums for such insurance shall be reimbursed HUMBLE by EASTMAN pursuant to the provisions of 'Exhibit A' hereof (Accounting Procedure)." (parenthesis supplied.)

ACCOUNTING PROCEDURE, Article I, Paragraph 10A:

"Premiums for workmen's compensation insurance, and any other insurance carried by Pipe Line Operator on the Pipe Line or its operations; together with *all expenditures incurred and paid in settlement of claims or judgments not recovered from the insurance carrier to fully discharge all liability of Pipe Line Operator ensuing from an accident occurring on or in connection with operations for the benefit of the Pipe Line account.*"

ACCOUNTING PROCEDURE, Article I, Paragraph 10B:

"*If no insurance is carried* on any or all of the above or other risks, *all actual expenditures* incurred and paid by the Pipe Line Operator *in settlement of any and all losses, claims, damages, judgments, and any other expenses including legal services shall be charged to the Pipe Line account.*"

ACCOUNTING PROCEDURE, Article I, Paragraph 14:

"Any other expenditures incurred by Pine Line Operator for the necessary and proper construction, maintenance, and operation of the Pipe Line."

(All emphasis supplied.)

Since Exxon was to be solely responsible for the operation and maintenance of the line, and in the normal course of events any claim for injury or damage arising out of those activities must necessarily be predicated upon the negligence of Exxon, it is obvious that the foregoing provisions contemplate indemnity to Exxon from losses due to its own negligence. However, two provisions of the contract, at least superficially, appear to be repugnant to those just quoted. For example:

CONTRACT, Article II, Page 3, Lines 17–19:

"HUMBLE shall not be liable or responsible for the results of line breakage or other such occurrences, except those which are the result of HUMBLE'S negligence or willful acts."

ACCOUNTING PROCEDURE, Article I, Paragraph 7:

". . . Operator shall charge the Pipe Line Account with the following items:

. . . . .

7. Damages or losses incurred by fire, flood, storm, or from any other cause not controllable by Pipe Line Operator through the exercise of reasonable diligence."

Because of the supposed repugnancy, the trial court disregarded the contractual provisions we first quoted and gave effect to those later quoted,[1] concluding that the contract did not protect Exxon from the results of its own negligence. In that respect we believe the learned trial judge erred. When the cardinal rules of contract construction are applied to the contract involved here, there is no repugnancy, and the clear and specific provisions describing the extent of Eastman's indemnity obligation remain unimpeached.

■ In the interpretation of a contract the whole agreement must be considered, and the object is not to determine what the parties meant to say, but the meaning of what they did say. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex.1968); *Caranas v. Morgan Hosts-Harry Hines Boulevard, Inc.*, 460 S.W.2d 225 (Tex.Civ.App. Dallas 1970, no writ). Provisions which are apparently conflicting are to be reconciled and harmonized, if possible, by reasonable interpretation so that the entire agreement can be given effect. *Southland Royalty Co. v. Pan American Petro. Corp.*, 378 S.W.2d 50 (Tex.1964); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951); *Young v. De La Garza*, 368 S.W.2d 667 (Tex.Civ.App. Dallas 1963, no writ); 3 Corbin on Contracts, Sec. 547, p. 173, n. 17 (1960); 13 Tex.Jur.2d Contracts, Sec. 142, p. 323. And where an

apparent repugnancy renders the contract ambiguous, consideration may be given to the subject matter of the contract and to all the circumstances surrounding its execution, including prior and contemporaneous expressions, negotiations and transactions, not for the purpose of varying or adding to the contract, but for the purpose of discovering the intention with which the words were used. *City of Pinehurst v. Spooner Addition Water Co.*, supra; *Trinity Universal Ins. Co. v. Ponsford Brothers*, 423 S.W.2d 571 (Tex.1968); *Universal C.I.T. Credit Corp. v. Daniel*, supra; *Remington Rand, Inc. v. Sugarland Industries*, 137 Tex. 409, 153 S.W.2d 477 (1941); *Caranas v. Morgan Hosts-Harry Hines Boulevard, Inc.*, supra.

■ As noted earlier, the trial court based its judgment mainly upon a finding that the quoted contractual provisions were repugnant. (Conclusions of law 3 and 7). Proceeding from that premise, the court applied various secondary rules of contract interpretation to reach its ultimate conclusion that the first quoted provisions must be disregarded and that those quoted later should be given effect. Such an approach is improper, however, because an effort must first be made to reconcile the apparent repugnancies so that the entire agreement can be given effect. It is only after such an effort fails and the provisions are in *irreconcilable conflict*, that the secondary rules of interpretation such as those favoring specific provisions over general, first stated provisions over later ones, and a construction against the scrivener are to be applied. *Southland Royalty Co. v. Pan American Petro. Corp.*, supra; *Hegar v. Tucker*, 274 S.W.2d 752 (Tex.Civ.App. Galveston 1955, writ ref'd n. r. e.).

■ The contract provisions first quoted which clearly say that Eastman will indemnify Exxon against all accidents and injuries to third parties arising or resulting from Exxon's operation and maintenance of the pipeline, a specific instrumentality, can be avoided in only one of two ways: either

---

1. Finding of fact 15 and conclusion of law 7.

by assuming that the parties mistakenly put those provisions in the contract; or by assuming that the parties intended to place the provisions in the agreement, but nevertheless did not intend for the words to mean what they so very plainly say. Neither can properly be done. The courts must presume that the parties intended, not only to include in their contract every provision contained in it, but also that they intended *every clause* to have some effect and in some measure to evidence their agreement. *City of Pinehurst v. Spooner Addition Water Co.*, supra; *R. H. Sanders Corp. v. Haves*, 541 S.W.2d 262 (Tex.Civ.App. Dallas 1976, no writ); *Phillips v. Inexco Oil Co., Inc.*, 540 S.W.2d 546 (Tex.Civ.App. Tyler 1976, writ ref'd n. r. e.). As stated by Justice Norvell in *Spence & Howe Construction Co. v. Gulf Oil Corp.*, supra:

". . . We cannot read clearly stated provisions out of a contract to which the parties have agreed." P. 637.

Indeed, it is the universally accepted rule that we must reject any interpretation which will nullify one or more of the contractual provisions. *Southland Royalty Co. v. Pan American Petro. Corp.*, supra; *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617 (1954); *Benge v. Scharbauer*, 152 Tex. 447, 259 S.W.2d 166 (1953); *Texas Pacific Indemnity Co. v. Building Material Dist., Inc.*, 502 S.W.2d 922 (Tex.Civ.App. Dallas 1973, no writ). To find against indemnity in this case would compel us to violate that rule and to disregard numerous explicit contractual clauses. A reasonable attempt to reconcile the apparent repugnancy, however, leads to a contrary result and one which gives effect to all of the provisions of the contract. For example, we think a reasonable interpretation of the two provisions which seemingly exclude indemnity for Exxon's negligence is that such provisions refer to equipment damage or a loss of products rather than to accidents or injuries involving third parties. The preliminary letter of intent supports such a conclusion as it provides that:

"Humble further agrees to operate and maintain the line, . . . *but you (Eastman) will assume the risk of line*

*losses*, and *Humble will only be liable for a loss of products caused by its negligence* or willful acts." (Emphasis and parenthesis supplied.)

The contract provisions relied upon by Eastman are actually confirmatory of the foregoing provision of the letter of intent, and can be easily and reasonably reconciled with the other contractual provisions expressly providing for indemnity. For example, the provision in Article II, Page 3 of the Contract which states that:

"HUMBLE shall not be liable . . . for the results of line breakage or other such occurrences, except those which are the result of HUMBLE'S negligence or willful acts.",

when considered to refer to damage to the equipment or a loss of products due to line breakage, is compatible with the letter of intent, and is not repugnant to, but is consistent with, the other provisions of the contract. And significantly, it does not mention litigation, judgments or claims resulting from accidents occurring in connection with the pipeline's operation and maintenance, as does the language contained in Article I, Paragraphs 8 and 10 of the Accounting Procedure. The remaining provision relied upon by Eastman, namely:

". . . Operator shall charge the Pipe Line Account with the following items:

. . . . .

7. Damages or losses incurred by fire, flood, storm or from any other cause not controllable by Pipe Line Operator through the exercise of reasonable diligence.",

can be reasonably interpreted as providing indemnity even against damage to the equipment or a loss of products resulting from occurrences beyond Exxon's control, commonly known as acts of God.

We think the nature of the business arrangement between Exxon and Eastman confirms our interpretation. The purpose was to transport petroleum products to Eastman for use in its plant. Eastman agreed that if Exxon would build and operate the pipeline (which would become East-

man's property at its option) it would reimburse Exxon for all the costs incurred in doing so. But obviously Eastman would not want to indemnify Exxon against its willful or negligent damage of the equipment, or assume responsibility for products placed in the line, for which it would be obligated to pay, but which might be lost because of Exxon's negligence. Provisions were therefore placed in the agreement making Exxon liable for those usual consequences of *line breakage*. Otherwise, the contract placed the ultimate authority for the safe and efficient operation of the line upon Eastman, and required Exxon, at Eastman's option *and expense*, to carry liability insurance to protect the pipeline account from claims such as those Exxon paid here.[2]

Eastman seems to take the position here that the contract is not ambiguous, and therefore the letter of intent is not admissible to aid in the construction of it; yet its brief insists that the contractual provisions are repugnant and that secondary rules of contract interpretation should be used to determine the contract's meaning. But if material contract provisions are repugnant, the contract is ambiguous, and preliminary expressions and negotiations are admissible to assist in determining the intent of the parties. 3 Corbin on Contracts, Sec. 547, p. 173, n. 17 (1960); 13 Tex.Jur.2d Contracts, Sec. 142, pp. 323–324. And a party may not assert that a contract is ambiguous or repugnant and at the same time insist that the circumstances of its execution may not be considered for the purpose of explaining the ambiguity or reconciling the apparent repugnancy. See *Maizel v. Bush*, 337 S.W.2d 337 (Tex.Civ. App. Dallas 1960, writ ref'd n. r. e.).

We are aware of the rule that if the contract provisions regarding indemnity against one's own negligence are not clear and unequivocal, parol evidence is not admissible to show that such an indemnity was intended, *Sira & Payne, Inc. v. Wallace & Riddle*, supra, but we have not resorted to the parties' letter of intent in order to establish an intention which is not otherwise expressed in the contract. The intent to indemnify with respect to a specific instrumentality is clearly and unequivocally expressed in the contract provisions we have quoted. The letter is considered only to explain *other* ambiguous provisions, and to resolve an apparent repugnancy.

Eastman also urges that the letter of intent should not be considered because one may infer, as did the trial court in Finding No. 4, that the formal contract, being a product of more detailed negotiation than the letter, departed from the original concept of indemnity as outlined in the letter. The answer to that contention is that, as expressed by the trial court in Finding No. 10, there is no evidence whatsoever as to any of the details of those discussions and negotiations. Furthermore, it can hardly be assumed that a change in the scope of indemnity was reflected in the formal contract when that contract still contains explicit provisions of indemnity which confirm the one contained in the preliminary letter of intent.

It seems clear to us that the only way to reconcile the apparent repugnancy and to give effect to all the provisions of the contract is to interpret it as providing indemnity to Exxon for all claims, settlements and judgments on behalf of third parties arising out of the operation or maintenance of the specific instrumentality, whether caused by Exxon's negligence or not, but as excluding indemnity for damage to the equipment or

---

**2.** In a case involving the converse of the situation here (contract requiring the *indemnitor, at his expense,* to carry liability insurance) our Supreme Court said such a requirement should not be considered evidence to establish an intent to indemnify against the consequences of the indemnitee's negligence when such an intent is not otherwise clearly expressed in the contract, but we see no reason why, when such an intent is clearly expressed by the contractual provisions as in this case, a provision requiring the *indemnitee* to carry insurance on itself *at the expense of the indemnitor* cannot be considered in explaining other ambiguous or apparently conflicting provisions of the contract. *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.*, supra.

a loss of products due to line breakage or line accidents unless such loss was due to some act or occurrence beyond Exxon's control.

All of Exxon's points of error are sustained except Numbers 2, 5, 11, 12, 20 and 21, which are overruled. The judgment of the trial court is reversed and judgment is here rendered that Exxon recover from Eastman Kodak Company the sum of $2,148,305.82 with interest at the rate of 9% per annum from June 20, 1978, until paid.